UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| KENT PAPCZUN, | ) | CASE NO. 5:21-CV-1003 |
| | ) | |
| Plaintiff, | ) | JUDGE DAVID A. RUIZ |
| | ) | |
| v. | ) | |
| | ) | |
| NUCO EDUCATION CORPORATION, *et al.*, | ) | MEMORANDUM AND ORDER |
| | ) | |
| Defendants. | ) | |

### Introduction

Before the Court is Plaintiff Kent Papczun's action against Defendant Nuco Education Corporation, the owner of Fortis College (Fortis), and Defendant Brian Parker (collectively Defendants), alleging, *inter alia*, that Defendants improperly discharged him from his position at Fortis in retaliation for complaining about Fortis' failure to accommodate his disability and/or for taking leave for that alleged disability under the federal Family and Medical Leave Act. R. 1. Now pending is Defendants' motion for summary judgment (R. 18), which Plaintiff opposes (R. 24). Defendants have replied. R. 25.

For the following reasons, Defendants' motion will be granted.

### Facts

<u>Background facts</u>

A brief statement of the relevant facts is given here, with greater details provided later in

1

the context of how those details apply to the motion for summary judgment.

Plaintiff was employed by Fortis as Program Director in the HVAC department of Fortis' satellite campus in Akron. R. 18-1, Page ID#: 149 (internal citation omitted). In March 2020, because of the COVID-19 pandemic, Fortis transitioned to distance learning but, since welding and HVAC courses involve hands-on lab work that cannot be done remotely, Plaintiff's classes were temporarily suspended. *Id.*, Page ID#: 151 (internal citation omitted). By June/July of 2020, in-person instruction had resumed, and all Program Directors, including Plaintiff, were required to return to campus to conduct classes. *Id.*

On May 27, 2020, however, Plaintiff was placed on a Performance Improvement Plan (PIP), which was signed by both Plaintiff and the Dean of Education, Bruce Campbell. *Id.*, Page ID #: 151-52; 484. Although Plaintiff states that prior to receiving the PIP he made a general request for "help" to the Campus President, Brian Parker, he also states that he did not relate this general request to any specific impairment and the record further shows that during the May 27 meeting to discuss the PIP, Plaintiff never told Fortis officials that any job performance issues were because of any physical impairment. *Id.* Page ID #: 152 (internal citation omitted). Moreover, the PIP did not result in a demotion or reduction in pay. *Id.*

Within days of the PIP, Plaintiff sent an email to both the Dean of Education (Campbell) and the Campus President (Parker) informing them that he was having problems with his eyes—such as watering, burning, and pain—that were impacting his computer use and thus needed to take personal time off (PTO) to see a doctor. *Id.*; R. 24-5, PageID# 715 (Plaintiff's June 1, 2025 email). Following a visit with his doctor, Plaintiff advised Peggy Aschelman, the local HR Director at Fortis, that he could return to work on Monday June 8, 2020. *Id.*, Page ID#: 152-53 (internal citations omitted). Plaintiff was then given personal time off (PTO) until

2

June 8, 2020, and told to provide a doctor's note for his absence. *Id*.

Plaintiff returned to work from PTO on June 8 and continued working through June 11, 2020. R. 24, Page ID#: 681. On June 11, 2020, Plaintiff sent an email copied to multiple Fortis officials expressing concern about his health, an increased workload, the lack of part-time instructors and also requesting an emergency leave of absence. *Id.*

That same day, June 11, 2020, Fortis' HR officer Aschelman emailed Plaintiff the FMLA certificate required to support granting leave, such certificate to be completed by Plaintiff's health care provider. R. 18, Page ID#: 154-55. June 11 is also the date Plaintiff went on leave, and he has not worked at Fortis since then. *Id*., Page ID#: 155.

On June 30, 2020, after Plaintiff had been on leave for 22 days without returning his FMLA paperwork despite multiple requests to do so by different Fortis officials, Campus President Parker sent a letter to Plaintiff stating that he needed to return the FMLA paperwork no later than July 8, 2020. *Id*., Page ID#: 156. Plaintiff then returned the paperwork by July 8, 2020, and Fortis approved FMLA leave the same day. *Id*. The paperwork submitted by Plaintiff in support of his leave was signed by his doctor on June 25, 2020, and stated that Plaintiff suffered from dry eye, would require 30 days of leave and was scheduled for a follow up appointment on August 4, 2020. *Id*.

On August 5, 2020, local Fortis HR director Aschelman emailed Plaintiff asking if he had been cleared to return to work or if he required additional leave, and further requested that Plaintiff respond that same day. *Id*., Page ID#:157.  Later that same day, Plaintiff sent an email to Vice President of Education Eric Goodman, with copies to President Parker and HR director Aschelman, that his doctor had released him to return to work and stated that he would like to return but had serious concerns similar to those he had previously raised about the increased

3

workload and lack of part-time instructors. *Id*. After Parker forwarded Plaintiff's email to Regional Vice President Peter Martinello, Martinello, in an email response dated that same day, told Plaintiff that if he was released to return to work by his doctor, he was expected to do so and that failure to return could be considered job abandonment. *Id*.

Plaintiff did not immediately reply, but on the morning of August 10, 2020, he emailed both Fortis' HR director and the campus president that "I am returning today [sic] I am going up to get a letter from my doctor." *Id*. However, later that same day (August 10, 2020) Plaintiff had not returned to work. *Id*., Page ID#: 158. Instead, he sent another email to Parker and Aschelman stating that, based upon recommendations from the Department of Health, he had determined that it was unsafe for him to return to in-person work due to COVID-19. *Id*. He also provided Fortis with a letter from his doctor that indicated, *inter alia*, that Plaintiff had seen "significant improvement in his symptoms and vision" since his last visit on August 4, 2020, and "is released to return to work." *Id*. The letter further stated that Plaintiff "may benefit from taking visual breaks throughout the day and [] instill[ing] eyedrops." *Id*.

At this point the new dean of education and Plaintiff's direct supervisor, Shannon McManamon, spoke with Plaintiff, asking him to meet with her on campus and in person to discuss issues affecting the HVAC training program. *Id.* Plaintiff responded that he would prefer meeting by Zoom, explaining that he was concerned about being exposed to COVID-19 on campus and so impacting his mother-in-law, who was at high risk for COVID complications. *Id*. McManamon, in return, told Plaintiff that the meeting would be in person and that all other Program Directors had already returned to working on-campus. *Id*., Page ID#: 158-59.

Campus President Parker also spoke by phone with Plaintiff on August 12. *Id*. During that call, which Parker memorialized in a contemporaneous email, Parker explained to Plaintiff

4

that he was expected to report to campus to attend the meetings with McManamon and himself the next day and told Plaintiff that in addition to this, there was an important phone call that all regional HVAC Program Directors were required to participate in that was also scheduled for August 13. *Id*., Page ID#: 159. Parker emphasized that it was important for Plaintiff to return to working on campus like all other Program Directors had done. *Id*. During the call, Plaintiff told Parker that he would return to work the next day. *Id*.

However, on August 13, 2020, Plaintiff did not return to work, nor did he attend the scheduled meetings with McManamon and Parker or the scheduled Program Directors' call. *Id*. Instead, on the morning of August 13, Plaintiff emailed Parker stating that after talking to his family, he decided that returning to campus was too risky based on his mother-in-law's health and so he would neither report to work nor attend the scheduled meetings that day. *Id*. He further stated that while he would return to campus to teach classes, attending meetings was "an unnecessary risk." *Id*.

After receiving this email from Plaintiff, Parker conducted a conference call with Regional Vice President Martinello, Corporate Director of Human Resources, Penny Hosey, Corporate General Counsel Cary Metz and Alex Teitelebaum, Hosey's direct superior, and recommended to them that he "would like to move forward with a termination if possible." R. 18-1, Page ID#: 159-60; R. 18-31, Page ID#: 540. That recommendation was unanimously approved by all those who had participated in the conference call, and, on August 13, 2020, a termination letter was delivered to Plaintiff. R. 18-1, Page ID#: 160; R. 18-32, Page ID#: 542. The termination letter detailed the events of August 12 and 13—Plaintiff stating that he would attend the in-person meeting with his supervisors and the conference call with other Regional HVAC Directors only to change his mind the day of without talking to his supervisors and

5

failing to call-in to the Director conference call—and concluded, "The school, and the program you are leading, is unable to continue your employment in this erratic and unpredictable manner." *Id.*

**Analysis**

<u>Applicable law – summary judgment</u>

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that movant is entitled to judgment as a matter of law," Federal Rule of Civil Procedure 56(a). The moving party has the burden of showing that there is no genuine dispute of material fact and satisfies that burden by either identifying those parts of the record which demonstrate the absence of any genuine issue of material fact, or if the issue is one on which the movant will not bear the burden of proof at trial, showing that there is an absence of evidence to support the nonmovant's case. *Lindsey v. Whirlpool Corp.,* 295 Fed. Appx. 758, 764 (6th Cir. 2008). Once the moving party meets its burden, "the nonmoving party may not rest upon its mere allegations … but rather, must present significant probative evidence" establishing the existence of a genuine issue of material fact for trial. *Id.*

<u>Applicable law- ADA disability discrimination/failure to accommodate</u>

In the absence of direct evidence of discrimination, courts use the familiar *McDonnell Douglas* burden-shifting framework to consider liability under the Americans with Disabilities Act (ADA). *Withers v. Nashville Historic Cemetery Association LLC*, 729 F.Supp.3d 802, 816 (M.D. Tenn. April 10, 2024) (citation omitted). Under this framework, the plaintiff must first establish a *prima facie* case of discrimination by demonstrating that: (1) he has a disability; (2) he is otherwise qualified for the job; (3) he suffered an adverse employment decision; (4) the employer knew or had reason to know of his disability; and (5) his position remained open or he

6

was replaced. *Id*. (citation omitted).

Once an employee establishes a *prima facie* case, the burden shifts to the employer who then has the burden of "demonstrating that there was a legitimate, nondiscriminatory reason for the adverse employment action." *Hrdlicka v. General Motors, LLC*, 63 F.4th 555, 567 (6th Cir. 2023) (citations omitted). If the employer can show such a reason, "[t]he burden then shifts back to the employee to show that the purported nondiscriminatory reason was actually a pretext designed to mask discrimination." *Id*. (citations and internal quotation marks omitted).

Initially, Plaintiff asserts a disability discrimination claim under both federal law and Ohio Revised Code § 4112.01 *et seq*. State law claims for disability discrimination are analyzed under the same framework as federal claims asserted under the Americans with Disabilities Act. *Jakubowski v. Christ Hospital. Inc.*, 627 F.3d 195, 201 (6th Cir. 2010). To establish a *prima facie* case for disability discrimination based on a termination of employment, Plaintiff must show: (1) that he is disabled; (2) that he is otherwise qualified and able to perform the essential functions of the job; and (3) that the employer terminated his employment because of his disability. *Kovac v. Superior Dairy, Inc.*, 998 F.Supp.2d 609, 623 (N.D. Ohio 2014). To establish a *prima facie* case based on a failure to accommodate claim, Plaintiff must demonstrate the first two elements outlined above (disability and ability to perform the essential functions of the job) plus the following additional elements: (3) Plaintiff requested a reasonable accommodation; and (4) Defendants denied or failed to provide the necessary accommodation. *Coles v. Johnny Appleseed Broadcasting Co.*, 479 F. Supp. 3d 585, 597 (N.D. Ohio 2020).

Consequently, an essential element of each claim requires a plaintiff to first show that he was disabled or perceived to be disabled. *See, Aldini v. Kroger Co. of Michigan*, 628 F. App'x 347, 350 (6th Cir. 2015) (failure to accommodate); *Withers*, 729 F. Supp. 3d at 816 (disability

7

discrimination).

*Plaintiff did not show he was disabled or perceived as disabled*

"An employer has notice of the employee's disability when the employee tells the employer that [s]he is disabled." *Hammon v. DHL Airways, Inc*., 165 F.3d 441, 450 (6th Cir. 1999) (citation omitted). However, "the employee need not use the word 'disabled,' but the employer must know enough information about the employee's condition to conclude that [s]he is disabled." *King v. Steward Memorial Hospital, Inc.,* 30 F.4th 551, 563-64 (6th Cir. 2022) (quoting *Cady v. Remington Arms Co*., 665 Fed. Appx. 413, 418 (6th Cir. 2016)) (internal citation omitted). To that end, *King* found that relevant information that would put an employer on notice of an employee's disability "could include among other things, a diagnosis, a treatment plan, apparent severe symptoms, and physician-imposed work restrictions." *Id*. at 564 (internal quotation and citation omitted).

An employer may not have knowledge of an employee's disability "merely because they took [medical] leave in the past and the employer is aware that [the employee has] some medical issues." *Id*., citing *Messenheimer v. Coastal Pet Products, Inc*., 764 Fed. Appx. 517, 519-520(6th Cir. 2019). Specifically, it is not enough to show that an employer knew the employee was disabled merely because the employer had a "general awareness" of some symptoms displayed by the employee. *Messenheimer,* 764 Fed. Appx. at 519 (citation omitted). Rather, "the question is whether [the employer] knew that [the employee's] condition substantially impaired her ability to perform her essential job functions." *King*, 30 F.4th at 564.

Here, Plaintiff initially contends that his medical history of retinal detachments, glaucoma and cataract surgery was well-known to Fortis. R. 24, Page ID#: 678; R. 18-2 (Papczun deposition), Page ID#: 207. He further argues that it was equally well-known that he

8

had "regularly sought treatment for his vision issues since 2014," R. 24, Page ID#: 678, and that he had previously missed work due to emergency eye surgery. *Id.*, Page ID#: 678-79. In addition, he recounts examples of requiring additional time to read a document at meetings; of accidentally bumping into walls or doors; of needing to wear an eye patch or being seen with seepage from his eyes. *Id*.

Plaintiff, however, further testified at his deposition that he "couldn't say" when these other events or situations occurred. R. 18-2, Page ID#: 207. He also testified that these other impairments or conditions he had with his eyes weren't "preventing" him from performing any of his job duties, but rather that they "hampered me" in daily job duties. *Id.* Indeed, he further testified that these conditions were visible "in every meeting" and "you might even notice it now." *Id*.

Apart from these vague references, Plaintiff did directly notify Defendants in June 2020 that he needed to take time off from work to seek medical treatment for his watery, burning, painful eye symptoms when using a computer. R. 24, Page ID#: 680. A few weeks later, on the recommendation of Defendant, Plaintiff applied for FMLA leave to deal with "severe dry eye syndrome," which was then granted. *Id*., Page ID#: 681. Plaintiff's application for leave contained, *inter alia*, a statement from his physician, Dr. Beckett, advising that for Plaintiff's eye condition to "properly heal," Plaintiff "needs to limit the extent of time he is on the computer." *Id*., Page ID#: 682. On August 10, 2020, Plaintiff received a note from Dr. Beckett "clearing him to return to work." *Id.*, Page ID#: 687. In that clearance, Dr. Beckett stated that Plaintiff "may benefit from taking visual breaks throughout the day and to instill drops when needed." *Id*. (internal quotation and citation omitted).

Based on the above-stated record, Plaintiff argues that there should at least be an open

9

question of fact as to whether Parker—the Fortis official who initiated Plaintiff's discharge—personally "believed that [Plaintiff] was in fact physically limited." *Id.*, Page ID# 694.

However, for purposes of summary judgment, those facts only establish that Defendant was, at most, on notice that Plaintiff had some health issues and symptoms, occurring at unspecified times in the past, and that immediately prior to the discharge, his physician specifically identified only a dry-eye condition that did not impede him from returning to work. Indeed, Plaintiff himself testified his symptoms didn't "prevent" him from performing his job functions but merely "hindered" him in unspecified ways. The severity of this "hindrance" may be shown by Plaintiff himself who stated during his deposition that the effects of his eye conditions were evident in "every meeting" he attended during his six years of working at Fortis and "might even [be] notice[d]" while he was testifying at his deposition. *See*, R. 18-2.ID#: 207. Plaintiff's conclusory assertions are insufficient, however, and are inherently premised on Plaintiff acknowledging that he was at work performing his essential job duties while presenting no evidence of a requested accommodation to modify his actual job duties.

Thus, even considered most favorably to Plaintiff, the Rule 56 record evidence is not sufficient to show that Plaintiff, at the time of the discharge, was disabled such that "[his] condition *substantially impaired* [his] ability to perform[his] essential job functions." *King*, 30 F.4th at 564 (emphasis added). Because there is nothing in the Rule 56 record that would permit a jury to link Plaintiff's prior health issues—setting aside for the moment Plaintiff's dry eye condition, which will be addressed next—to an inability to work, it must be concluded that Defendants are entitled to summary judgment on the issue whether Plaintiff has demonstrated a disability.

As to Plaintiff's dry eye condition, there is no dispute that this condition, as well as a

10

physician's recommendation for "visual breaks" or reduced computer time and the use of eye drops, were communicated to Defendants. There is also no dispute that prior to that doctor's note being created, Plaintiff took PTO on June 1 for the purpose of seeing his doctor, with the objective of returning to work June 8. On June 10, Plaintiff was asked to provide a doctor's note supporting the prior week's PTO. The doctor's letter, dated June 2, was provided on June 10. The next day, June 11, Plaintiff told Fortis his eye condition was getting better but complained to Fortis about having an increased workload that, he alleges, was a refusal to provide accommodation as required by his doctor's letter. June 11 is also the day Plaintiff began FMLA leave at Fortis. Further, the record shows that on August 5, Plaintiff's doctor authorized him to return to work, which fact was communicated to Defendants.

      Thus, even reading the June 2 doctor's letter most favorably to Plaintiff as a statement of a disability from dry eyes, when Plaintiff was terminated on August 13, 2020, he had not been disabled from dry eyes for over a week according to the August 5 letter from that same physician who made the initial diagnosis. Indeed, as noted by Defendants, Plaintiff's medical records from his August 4 eye examination show that his uncorrected vision was 20/20 in one eye and 20/30 in the other, with his dry eye symptoms "much improved" and the only ongoing treatment recommendation being for visual breaks and the use of eye drops. R. 25, Page ID#: 834. On this record, Plaintiff cannot show that he was disabled by dry eye condition at the time he was terminated, which is a necessary element of a disability discrimination action.

      *Other acts of disability discrimination/failure to accommodate*

      That leaves the question of whether any other action besides termination was done during the time when Plaintiff was allegedly disabled, such as failing to accommodate his acknowledged dry-eye condition during the period when that was known to Fortis. Plaintiff

11

alleges that during the three days he returned to work after seeing his eye doctor – June 8 to June 11 – Defendants not only failed to accommodate his dry eye condition but increased his workload. *See,* R. 1, Page ID#: 16.

However, as noted, Plaintiff acknowledges that Fortis permitted Plaintiff to take medical leave when he first asked for it and kept Plaintiff on leave for as long as required, with his doctor clearing him to return to work before he was required to return. Thus, the question of whether reasonable accommodation was provided narrows to be whether agreeing to and facilitating an FMLA leave constitutes denying or refusing a request for an accommodation.

Case authority suggests the opposite. In *Schobert v. CSX Transportation,* 504 F.Supp. 3d 753, 794 (S.D. Ohio 2020) the Court stated:

> In its traditional form, a failure to accommodate claim exists when an employee asks for a reasonable accommodation and the employer explicitly denies that request. *See, e.g.*, *Smith v. Henderson*, 376 F.3d 529, 534-39 (6th Cir. 2004) (allowing failure to accommodate claim to survive summary judgment when the employer "flatly denied" the employee's request for accommodations.). That kind of failure to accommodate claim does not work here because, as both [plaintiffs] acknowledge, every time they requested FMLA leave, [the employer] granted their requests.

*Id.*

Here, as in *Schobert*, as soon as Defendants were made aware of a need for an accommodation so that Plaintiff would not be teaching extra classes while he was dealing with his dry eye condition Defendants agreed with Plaintiff's request to take leave and advised him that he was eligible to apply for FMLA leave. The fact that the Defendant responded within 24 hours to the request for leave cannot be considered an unreasonable delay in accommodating that request. *See*, *Gerton v. Verizon South, Inc.*, 145 Fed. Appx. 159, 168 (6th Cir. 2005) (employee must show that any delay in responding to the request for accommodation was

12

"unreasonable"). Thus, Defendants are entitled to summary judgment as to that element of Plaintiff's case alleging a failure to accommodate his dry eye condition.

*Failure to accommodate – remote work*

To the extent that Plaintiff is asserting that Defendants refused to accommodate a request to attend meetings by Zoom or otherwise perform his work while not on-campus after the time it was determined by his doctor that he was cleared to return to work, such a request would not trigger a need by the employer for an accommodation under disability law, since Plaintiff's doctor had cleared him to return to work without any such limitations. Thus, only requests for accommodation made during the time from June 2 to August 5 would impose an obligation for reasonable accommodation on Defendants. And Defendants accommodated Plaintiff's leave request.

Moreover, a review of the record shows that on August 10—after Plaintiff had been cleared to return to work—he initially told Fortis that he was returning to work that day. Later that same day, and for the first time, Plaintiff told Fortis that based on Department of Health recommendations and to protect his mother-in-law, he did not want to attend in-person meetings and preferred to attend meetings remotely. On August 12, after being told by Campus President Parker that it was important for Plaintiff to be on-campus for meetings the next day, Plaintiff said that he would be there. But the next day, when the meeting was scheduled to occur, Plaintiff emailed President Parker stating that, after talking to his family, he changed his mind and would not attend meetings on campus, feeling them too risky for reasons unrelated to any alleged physical impairment of Plaintiff.

As this summary makes clear, up until the very day before he was terminated Plaintiff was telling Fortis he intended to attend an important scheduled meeting on campus with his

13

supervisors, notwithstanding any earlier statements about preferring to use Zoom for such meetings. It is not possible to glean from the record how there was any request to accommodate alternative meeting practices based on an alleged disability. During Plaintiff's leave, he was neither expected at any meetings nor did he request any alternative treatment for when he returned. It was only *after* he was medically cleared to return to work, free from alleged disability, and indicated that he would return to campus, that on August 10 he raised a concern about returning to campus due to potential effects of COVID-19 on his mother-in-law. As noted, a request like that from one who is not then disabled or perceived to be disabled imposes no duty on an employer under disability law to make any reasonable accommodation of such request. *See*, *Anderson v. Inland Paperboard and Packaging, Inc.,* 11 Fed. Appx. 432, 437 (6th Cir. 2001) (because Plaintiff was unable to show that any of his physical impairments rise to the level of a disability under the ADA, the court is not required to address the other elements of his case).

*Failure to follow progressive discipline/remediate/investigate*

Plaintiff makes two related but distinct claims in this regard. First, Plaintiff asserts that after receiving his June 11, 2020 email complaining about an increased workload Defendants failed to interview Plaintiff or otherwise investigate his complaint with the objective of making an accommodation to his dry eye condition. *See,* R. 24, Page ID# 697-98. Second, Plaintiff contends that Defendants failed to accommodate his August 10 request to attend meetings by Zoom (*id*. at Page ID#: 687-88) and then failed to investigate his complaints that might have afforded him the benefits of a progressive discipline policy that could have potentially resulted in Plaintiff being warned or suspended before being terminated. *Id*., at Page ID#: 685-86.

As to the first alleged instance, the record is clear, as related above, that Plaintiff went

14

on FMLA leave within days of informing Defendants of his workload complaints and after Plaintiff submitted a doctor's note relating to his dry eye condition. As was discussed above, there is no evidence in the record to suggest that this short period between the receipt of Plaintiff's complaint and his taking leave at his request was unreasonable. While the ADA imposes a mandatory duty on both employer and employee to engage in a good faith informal, interactive process to determine a reasonable accommodation once a request for one is made, *Kovac,* 998 F.Supp.2d at 619, taking a medical leave, particularly when requested by the employee, satisfies an employer's duty to provide for a reasonable accommodation. *Blanchet v. Charter Communications, LLC*, 27 F.4th 1221, 1229 (6th Cir. 2022) (citation omitted) ("[M]edical leave can constitute a reasonable accommodation under the ADA.").

As to events in August 2020, the record shows that Plaintiff's request to attend/participate in work-related meetings remotely was not a disability-related accommodation request. While his request was made relatively contemporaneous with Plaintiff's doctor releasing him to return to work, it will be reviewed here with the understanding that the request was made prior to Defendants having knowledge of that doctor's report.

In the Sixth Circuit case of *Tchankpa v. Ascena Retail Group, Inc.,* 951 F.3d 805 (6th Cir. 2020), the plaintiff likewise sought an accommodation for remote work and, as part of an ADA discrimination suit, alleged that his employer failed to accommodate that request. The Sixth Circuit found that the request for remote work itself was unreasonable, thus obviating the requirement for the employer to engage in any discussion of such an accommodation. Specifically, it held that without a showing that it was medically necessary that Plaintiff work from home, the employer had no duty to grant a request for remote work as an accommodation.

15

*Id.*, at 813 (citation omitted).

To the extent that Plaintiff seeks to assert an independent claim that Defendants' failure to engage in the interactive process regarding remote work itself violated the ADA or the Ohio statute, such a claim is not actionable on this record. *Thompson v. Fresh Prods. LLC,* 985 F.3d 509, 525-26 (6th Cir. 2021).

*Similarly situated*

Finally, as Defendants point out, Plaintiff has not shown that any similarly situated non-disabled employees of Fortis were treated more favorably. Specifically, as regards to the request to attend meetings remotely or to invoke a potential risk from COVID-19 as a reason for not attending scheduled meetings in-person, Plaintiff has not shown that any similarly situated non-disabled Fortis employee was treated more favorably than he was. Plaintiff's failure to identify such instances is fatal to his ADA discrimination claim. *Swint v. E.I. DuPont de Nemours and Co.*, 2020 WL 1531267, at *5 (N.D. Ohio March 31, 2020) (citations omitted).

Disability/FMLA retaliation

To establish a *prima facie* case of either disability or FMLA retaliation a Plaintiff must establish that: (1) he engaged in a protected activity protected under the ADA or FMLA; (2) Defendants knew of the protected activity; (3) Plaintiff suffered an adverse employment action; and (4) there is a causal link between the protected activity and the adverse action. *Clark v. City of Dublin*, 178 Fed. Appx. 522, 525 (6th Cir. 2006) (elements of ADA retaliation); *Parks v. UPS Supply Chain Solutions, Inc.,* 607 Fed. Appx. 508. 513 (6th Cir. 2015) (elements of FMLA retaliation).

As detailed above, the evidence establishes that Plaintiff was neither disabled nor regarded as disabled at the time he was terminated. Both the August 4, 2020 physician's letter

16

clearing Plaintiff to return to work and his own statements to Fortis made on August 12, 2020, the day before his termination, that he would report to work the next day, clearly indicate that he was neither disabled nor did Fortis have any basis for believing him to have an on-going disability. Thus, the decision to terminate him on August 13, 2020, was made when he was not disabled.

Plaintiff, however, argues that the decision to terminate him was in retaliation for taking FMLA leave in June. To that end, he argues that sufficiently close temporal proximity exists between the June event of taking FMLA leave along with his August 5, 2020 emailed complaints and the August 13, 2020 termination to create a jury question of whether he was terminated because of, or in retaliation for, these events. R. 24, Page ID#: 703-04. He further contends that because Fortis' reasoning in terminating him was not grounded in fact—*i.e.*, Plaintiff asserts he did not refuse to return to in-person work, but rather just requested to not participate in in-person meetings while agreeing to return to campus to teach—combined with proximity to the protected activity of taking leave and/or making a request for accommodation establish that Defendants' reason for termination was pretextual. *Id.*, Page ID#: 704-05.

First, Plaintiff's attempt to find that the termination here was incorrectly based on a blanket refusal to return to work instead of a refusal to attend in-person meetings ignores the obvious context of the events which clearly demonstrate the termination was grounded on Plaintiff's decision not to return to work after telling Parker that he would.

Further, unless proximity between events is "immediate," such proximity must be coupled with other indicia of retaliatory conduct to infer causality. *McCoy v. Mv Residential Property Management, Inc.,* 2016 WL 1392483, at *7 (S.D. Ohio April 8, 2016) (citation omitted). The first stated event occurred in June 2020 – almost two months before termination.

17

The second, while closer in time, was followed by the significant intervening event of Plaintiff first agreeing to appear on-campus for an important meeting with his supervisors and then, the next day, refusing to do so for his own reasons as to the appropriateness of his employer's directive. That, coupled with Plaintiff's failure to attend the Regional Directors HVAC conference call without explanation, are sufficient intervening reasons for his termination.

An employee is not permitted to unilaterally choose which job duties he will perform, *EEOC v. Ford Motor Co.*, 782 F.3d 753, 764 (6th Cir. 2015), and a claim of retaliatory discharge fails, and a claim of pretext is overcome, when the employer shows that the discharge came about because the employee disobeyed an order from a superior. *Taylor v. City of East Cleveland*, 2021 WL 4459466, at *7 (N.D. Ohio Sept. 27, 2021). Thus, the record evidence establishes that Fortis had a legitimate, non-discriminatory reason for terminating Plaintiff. There is no material factual issue regarding the lack of a causal link between Plaintiff's termination and any alleged protected activity.

*Pretext*

As detailed above, Plaintiff has not established a *prima facie* case for any of his claims. Further, as also detailed above, even if it were assumed *arguendo* that such a case was made, the evidence is that Fortis has established a legitimate non-discriminatory reason for discharging Plaintiff. Thus, the burden then shifts back to Plaintiff to show that this reason was merely pretextual.

Pretext can be established in three ways: (1) that the proffered reason has no basis in fact; (2) that the proffered reason did not actually motivate the termination and (3) the proffered reason was insufficient to motivate the discharge. *Dews v. E.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). Temporal proximity cannot be the sole basis for establishing pretext, although

18

"suspicious timing" can be a "strong indicator of pretext when accompanied by some other, independent evidence." *Bell v. Prefix, Inc.*, 321 Fed. Appx. 423, 431 (6th Cir. 2009) (citation and internal quotation marks omitted). Whatever method the plaintiff chooses, he always bears the burden of producing sufficient evidence from which a jury could reasonably reject the defendant's explanation and infer that the defendant intentionally discriminated against the plaintiff. *Seeger v. Cincinnati Bell Telephone Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012) (internal citation and quotation marks omitted).

Here, although Plaintiff seeks to characterize his claim of pretext as being grounded in the first method—*i.e.*, that the stated reason had no basis in fact, *see*, R. 24, Page ID#: 705—he most strongly argues that his refusal to attend in-person meetings while offering to attend by Zoom falls under the third reason—that it "was not sufficient to warrant termination." *Id*. Plaintiff contends that the requirement to attend in-person meetings was unnecessary and/or illogical, and thus pretextual, because such meetings could have been conducted remotely. *Id*., Page ID# 705-06.

Notwithstanding Plaintiff's personal views about the importance of in-person meetings and corresponding views that requiring his attendance at such meetings was unfounded, "pretext requires more than showing that the [employer's] decision was mistaken, ill-considered or foolish," and "so long as [the employer] believes those reasons, pretext has not been established." *Coggin v. Medline Industries, Inc.*, 749 F.Supp.3d 960, 970 (N.D. Illinois Sept. 30, 2024) (citation and internal quotation marks omitted). More to the point, an employee cannot show pretext by merely quarreling with the wisdom of the work rule he violated. *See, Chapman v. Al Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000).

However, it may be possible to establish pretext if the discharged employee can show

19

that other employees in a similar context were treated differently. S*ee*, *Braithwaite v. Timken Co.*, 258 F.3d 488, 497 (6th Cir. 2001) (citation omitted). But that is not the case here. Plaintiff has not identified any other employee of Fortis who was permitted to continue with his employment after refusing to attend managers' meetings or to return to in-person work. R. 25, Page ID#: 841. Nor has he presented any meaningful basis to find that refusing to return to work for in-person meetings with one's supervisors and failing to attend—without explanation—an important telephone conference with Regional Directors were insufficient to justify termination.

Accordingly, Plaintiff has not established that the stated reason for his discharge was pretextual nor that his conduct was insufficient to warrant discharge.

Thus, Defendants' motion for summary judgment as to claims of retaliatory discharge under both the ADA and FMLA is granted.

## Conclusion

For the reasons stated, Defendants' motion for summary judgment (R. 18) is hereby GRANTED. The matter is thus DISMISSED with prejudice.

IT IS SO ORDERED.

Date:   June 26, 2025                                         /s/ *David A. Ruiz*
                                                              David A. Ruiz
                                                              United States District Judge